**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| PATRICIA E. CLAYTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 10 C 4449 |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of ) | |
| Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Patricia E. Clayton ("Clayton") brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final agency decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Title II Disability Insurance Benefits ("DIB") pursuant to the Social Security Act, 42 U.S.C. §§ 416(i), 423(d). Before the Court is Clayton's motion for summary judgment, or in the alternative, motion for remand and the Commissioner's motion for summary judgment. For the following reasons, the Court grants Clayton's motion for summary judgment or remand, and denies the Commissioner's motion for summary judgment. The Court remands this matter to the ALJ for a further determination of whether Clayton had an impairment that meets or is equal to one of the listed impairments in 20 C.F.R. Part 404, Subpart P., Appendix 1, as required at step three of the sequential analysis under 20 C.F.R. §§ 404.1520 and 416.920.

### PROCEDURAL BACKGROUND

On April 6, 2005, Clayton applied for DIB alleging that she became disabled on October 1, 2000 after the March 31, 1999 expiration of her DIB insured status. (R. 23, Admin. Record, at

68-73.) Subsequently, Clayton filed another DIB application on October 25, 2006 alleging that she became disabled on September 20, 1996 before her insured status expired.[1] (*Id*. at 14.) On December 21, 2006, Clayton's application was initially denied and on February 27, 2007 Clayton's application was denied upon reconsideration. (*Id*. at 58-61, 63-65.) On April 2, 2007, Clayton filed a timely request for a hearing and on March 26, 2009, Clayton appeared and testified before Administrative Law Judge ("ALJ") Kenneth Stewart in Oakbrook, Illinois. (*Id*. at 21-52.)

At the hearing, medical expert Dr. Ashok Jilhewar, vocation expert ("VE") Cheryl Hosieth, Clayton, and Clayton's husband, Paul Clayton, testified. (*Id*. at 49-51.) On June 25, 2009, ALJ Stewart rendered his decision finding that Clayton was not disabled at any time on or before March 31, 1999 – the date her DIB insured status expired – because she could perform a significant number of jobs in the national economy. (*Id*. at 14-20.)

The ALJ's relevant Findings of Fact and Conclusions of Law, include:

1. The claimant last met the insured status requirements of the Social Security Act on March 31, 1999.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of September 29, 1996, through her date last insured of March 31, 1999.

3. Through the date last insured, the claimant had the severe impairment of cerebellar ataxia.
...
4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I (20 C.F.R. 404.1525 and 404.1526).

---

[1] Clayton's October 25, 2006 DIB application is not in the administrative record.

>     ...
>
> 5.    Through the date last insured, the claimant had the residual functional capacity to perform a full range of sedentary work as defined by 20 C.F.R. 404.1567(a).
>     ...
>
> 10.   Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.
>     ...
>
> 11.   The claimant was not under a disability, as defined in the Social Security Act, at any time from September 20, 1996, the alleged onset date, through March 31, 1999, the date last insured.

(*Id*. at 16-19.)

On August 18, 2009, Clayton requested a review of the ALJ's decision with the Social Security Administration's Appeals Council and on May 13, 2010, the Appeals Council denied the request for review. (*Id*. at 1-4, 9-10.) Clayton filed the present action on July 16, 2010.

**FACTUAL BACKGROUND**

Clayton was born on September 25, 1966, completed high school and one year of college. She worked as a receptionist at a pediatric medical office from 1989 to 1994. (*Id*. at 68, 95, 97.)

**I.    Relevant Medical Evidence in the Administrative Record**

On April 30, 2001, Clayton saw Dr. Mahese Parikh, a neurologist in Crystal Lake, Illinois, due to her difficulty with balance and stiffness while walking, as well as her history of speech problems. (*Id*. at 224.) Dr. Parikh's examination revealed mild dysarthria (speech problems), a left facial droop, mild left hemiparesis (muscle weakness on one side of the body), a gait with circumduction (circular motion) of the left foot, mild dysmetria (incoordination) in the left leg and on finger-to-nose and heel-to-shin testing, and increased reflexes. (*Id*.) After the

3

examination, Dr. Parikh concluded that Clayton had a mild left hemiparesis with dysarthria and recommended that Clayton undergo MRIs of the brain and cervical spine. (*Id.* at 225.)

The following month, an MRI of Clayton's brain revealed "questionable increased signal enhancement" and the radiologist recommended further evaluation by a CT scan of the temporal bones. (*Id*. at 222.) The cervical spine MRI revealed a normal spine, but moderately severe posterior fossa atrophy. (*Id*. at 218.) In addition, a CT scan of the temporal bones revealed marked cerebellar atrophy. (*Id*. at 209, 236.)

Clayton followed-up with Dr. Parikh on June 8, 2001, at which time she complained that she had difficulty swallowing. (*Id*. at 207-08.) Dr. Parikh's neurological examination revealed gait ataxia (gait incoordination) and left hemiparesis. (*Id*. at 207.) Further, Dr. Parikh discussed using a cane and referred Clayton to a speech pathologist to evaluate her difficulty swallowing. (*Id*. at 208.) In the meantime, a swallow test revealed Clayton had a normal ability to swallow. (*Id.* at 205.) Dr. Parikh reported that Clayton was doing well, but was still "a little wobbly" with an ataxic gait. (*Id.* at 206.) In August 2001, Clayton complained of headaches and difficulty walking. (*Id.* at 202.) Dr. Parikh prescribed medication for the headaches and gait and balance training, as well as strengthening exercises. (*Id.* at 202-03.)

In October 2001, Clayton went to the Mayo Clinic in Rochester, Minnesota for a neurological evaluation. (*Id.* at 166-75, 182-201, 317-45.) Clayton informed Dr. Bruce Evans, a neurologist, that she had an ataxic gait and weakness and explained that she noticed problems with running and stiffness that were gradually progressive that affected her balance and gait. (*Id.* at 174, 190, 337.) She further clarified that her speech was somewhat jumbled and she had increasing difficulty trying to enunciate clearly. (*Id*.) In addition, Clayton explained that she did

4

not see a physician for any of her problems until a few months prior to her visit to the Mayo Clinic and that she went to a doctor because a chiropractor at her health club noticed her gait and recommended an evaluation. (*Id.*) Clayton further told Dr. Evans that her MRIs showed cerebellar atrophy. (*Id.*)

Dr. Evans' examination revealed dysarthria, increased reflexes, a markedly ataxic gait, minimal ataxia in the upper and lower extremities, minimal dymetria, and some gross jerky eye movements. (*Id*. at 175, 191, 338.) In addition, Dr. Evans reviewed Clayton's MRIs, which showed "striking cerebellar degeneration and atrophy, which [wa]s more marked in the midline than in the hemispheres but [wa]s significant everywhere." (*Id.*) Dr. Evans then diagnosed progressive cerebellar degeneration opining that it was caused by a genetically determined disease. (*Id*.) He thus ordered further testing and a genetic consultation. (*Id*.)

Next, Clayton saw Dr. David Whiteman, a genetic specialist at the Mayo Clinic. (*Id*. at 170-74, 186-90, 342-45.) Clayton's husband informed Dr. Whiteman that when he first met his wife, she had "mild difficulties with her speech, causing her to speak more slowly for clarity of pronunciation." (*Id.* at 171, 187, 342.) He further explained that during the three to four years prior to her Mayo Clinic visit, his wife had developed speech problems and increasing problems with her coordination and weakness. (*Id*.) Also, he said his wife occasionally felt stiff and that she had increased balance problems when it was cold. (*Id*.) She also had migraine headaches during the premenstrual part of her cycle that became more severe and more frequent occurring apart from her menstrual cycle. (*Id*.)

Dr. Whiteman's examination revealed that Clayton had a broad-based, shuffling, ataxic gait, reduced motor strength, reduced muscle tone, an obvious intention tremor on finger-to-nose

5

testing, and jerky eye movements. (*Id.* at 172, 188, 344.) Further, Dr. Whiteman noted that Clayton's two MRIs revealed cerebellar ataxia and that blood tests revealed weakly positive antigliadin antibodies (IgA). (*Id*. at 173, 189, 344.) Dr. Whiteman's final assessment stated in part:

> Mrs. Clayton has pure cerebellar ataxia. The acute history is three to four years' duration, but there is a strong suspicion that dyspraxia, which is often the most sensitive sign of cerebellar dysfunction, may have been developing over the past 15 years.

(*Id*.)

While at the Mayo Clinic, Clayton also saw Dr. John A. Schaffner, a specialist in gastroenterology and hepatology. (*Id.* at 170, 186, 333.) Dr. Schaffner noted that Clayton had an abnormal IgA test, but no gastrointestinal complaints, no family history of celiac disease, and no abdominal abnormalities. (*Id*.) He further noted that the mildly elevated IgA was "only minimally suggestive of the possibility of celiac disease." (*Id.*) In fact, a small bowel biopsy showed no evidence of celiac sprue disease. (*Id.* at 197, 324.)

Clayton also saw Dr. Luis A. Garcia, an ear, nose, and throat specialist at the Mayo Clinic. (*Id*. at 167, 183, 330.) Clayton complained to Dr. Garcia that she had dizziness "for the past couple of years, off and on" that was associated with looking up, looking down, bending down, laying down, and getting up from bed. (*Id.*) The physical exam of Clayton's ears, nose, mouth, throat, and neck was unremarkable. (*Id.*) Dr. Garcia also noted that an audiological exam revealed normal hearing with 100% word recognition. (*Id*. at 167, 183, 330.) Thereafter, Dr. Garcia diagnosed positional vertigo and recommended Dix-Hallpike maneuver testing. (*Id*. at 167, 183, 330.) John Carpenter, a physical therapist at the Mayo Clinic, then conducted the Dix-Hallpike maneuver test, which showed an upward drift of Clayton's eyes, but no true

6

nystagmus (involuntary eye movement). (*Id*. at 169, 185, 339.) Carpenter concluded that Clayton's dizziness with position changes was related to ocular ataxia. (*Id.* at 167, 183, 330.)

At the conclusion of Clayton's visit to the Mayo Clinic, Dr. Evans reported that Clayton had "a rather extensive work-up" and noted that "I don't see any abnormality implicating a specific metabolic or genetic or secondary cause" for Clayton's medical problems. (*Id*. at 168, 184, 334.) Dr. Evans diagnosed primary cerebellar degeneration and he noted that Clayton's eye movement abnormalities and sense of dizziness were "almost certainly part of the primary cerebellar process." (*Id.*) He further stated that there was no specific treatment for his diagnosis, but noted that physical therapy might help Clayton's gait and protect her against falls and that speech therapy might be beneficial. (*Id.*) In addition, Dr. Evans noted that Clayton's impairment would slowly progress and that walking would become more difficult. (*Id*. at 168, 184, 334.) A few months later, in January 2002, Dr. Whiteman reported that lab tests did not reveal any definitive genetic cause for Clayton's ataxia. (*Id.* at 340.)

In March 2002, Clayton saw Dr. Thomas J. Kelly at the University of Chicago Hospitals for a radiology consultation. (*Id*. at 257, 290.) Clayton reported to Dr. Kelly that she had a three or four year history of gait problems, hand clumsiness, and thick speech. (*Id*.) Dr. Kelly's examination revealed nystagmus in the eyes, a stiff, mildly ataxic gait, some difficulty with tandem walking, and mild difficulty with heel/toe walking, but full 5/5 muscle strength, normal reflexes, normal sensation, and normal finger-to-nose testing. (*Id*. at 257-58, 292.) Also, Dr. Kelly noted that the Mayo Clinic evaluations did not reveal any specific cause for the cerebellar dysfunction. (*Id.* at 258, 292.) Thereafter, Dr. Kelly ordered some lab work and gait testing. (*Id*.)

7

One year later, in March 2003, Clayton returned to Dr. Kelly. (*Id.* at 255, 288, 384.) Clayton reported that her gait was more unstable and her legs tired while walking. (*Id.*) Clayton further stated she had increased problems with eye fluttering and diploplia (double vision) and had been fitted with prism eyeglasses to reduce the double vision. (*Id.*) She said she had some headaches, for which she took Excedrin Migraine, and she reported that the Excedrin worked fairly well. (*Id.*) Her exam revealed mild speech problems, nystagmus and other eye movement abnormalities, increased reflexes, a broad-based, spastic, mildly to moderately ataxic gait, very mildly ataxic heel-to-shin movements, and moderately spastic muscle tone in the legs, but full 5/5 motor power in all extremities, normal muscle tone in the upper extremities, and normal finger-to-nose testing movements. (*Id.* at 255-56, 289, 384-85.) Dr. Kelly stated that Clayton's lab tests revealed that she had spinocerebellar ataxia (SCA) type 8, and that her gait had "deteriorated somewhat with the emergence of a broad base with increased spasticity." (*Id.* at 256, 289, 385.) Dr. Kelly then ordered physical therapy with gait testing and told Clayton to switch from Excedrin to another over-the-counter medication for her headaches. (*Id.* at 256, 289, 385.)

Thereafter, Clayton saw Dr. Kelly for check-ups every six months through September 2006. (*Id.* at 247-53, 268-86, 303-08, 386-90, 401-02.) In particular, in September 2003, Clayton reported to Dr. Kelly that her walking had become "somewhat more unstable" during the past six months, but she had not fallen. (*Id.* at 253, 286, 386.) Dr. Kelly noted that since her last visit, Clayton could walk without a cane, but that a cane added stability and concluded that Clayton had shown gait deterioration evidenced by spasticity. (*Id.* at 254, 287, 386.) In March 2004, Clayton stated that she continued to have an unstable gait and that she developed unusual

8

sensations in her legs, which occurred at rest and at night. (*Id*. at 251, 283, 388.) Clayton also stated that she was "able to use her hands adequately to carry out all of her activities of daily living," but felt her left hand was somewhat slower than her right hand. (*Id.*) She further reported occasional and minor difficulty swallowing. (*Id.*) Dr. Kelly concluded that Clayton's ataxia had remained stable for the six month period, but she had developed restless leg syndrome for which he gave medication samples. (*Id*. at 252, 285, 389.)

Six months later, Clayton told Dr. Kelly that she had not started taking the medication and also reported increased gait and speech difficulties. (*Id*. at 249, 280, 390.) Dr. Kelly referred Clayton for a swallow evaluation and prescribed medication for the spastic gait. (*Id*. at 250, 281, 391.) In March 2005, Clayton explained to Dr. Kelly that her gait had not significantly declined during the prior six months and that she had swallowing difficulties. (*Id*. at 247, 277, 303.) Dr. Kelly, however, noted that the swallow evaluation was normal. (*Id*. at 247, 264, 277, 301, 392.) Dr. Kelly then concluded that Clayton was stable from a neurological perspective. (*Id*. at 248, 278, 304.)

At her six month check-up in September 2005, Clayton had "no major changes in her condition." (*Id*. at 274, 305.) Although her gait was unbalanced, Clayton stated that she felt more secure with a cane and had not been falling. (*Id.*) Clayton also reported to Dr. Kelly that handwriting was difficult, but she was able to carry out all of her daily activities. (*Id*.) She further stated that she had restless leg syndrome for which she occasionally took medication and that she had migraine headaches two or three times a month. (*Id*.) Dr. Kelly concluded that Clayton was "essentially unchanged from her visit in March." (*Id*. at 276, 306.)

In March 2006, Clayton reported to Dr. Kelly that she had no significant change in her

9

condition since her last visit with the exception of a bit more gait instability. (*Id*. at 271, 307.) Clayton also explained that she had been using a single-prong cane, rather than a four-pong cane, and that her migraines occurred less frequently. (*Id*.) Dr. Kelly noted that Clayton could walk with or without a single-prong cane, but suggested that Clayton use a walker or a four-prong cane for added stability. (*Id*. at 273, 308.) Meanwhile, Clayton's June 2006 MRI revealed moderate cerebellar atrophy. (*Id.* at 297, 299, 400.)

At her six-month check-up on September 8, 2006, Clayton told Dr. Kelly that she had eyesight difficulties, particularly involving focusing while reading, but felt her gait was more stable with a four-prong cane. (*Id*. at 268, 401.) Dr. Kelly concluded that the gait was unchanged, but said the nystagmus had increased. (*Id.* at 269, 402.) He then advised Clayton to stop driving and wrote a prescription for a wheelchair so she could use it on long distance travel. (*Id*.)

On September 11, 2006, Dr. Kelly opined that Clayton could perform a low-stress job, sit for more than two hours at a time, and sit for at least six hours in an eight-hour day. (*Id*. at 372.) Dr. Kelly also noted that Clayton could stand for five-to-ten minutes at a time, and walk less than one block, and opined that Clayton needed a job where she could shift positions "at will." (*Id*. at 372-73.) Further, Dr. Kelly stated that Clayton could rarely lift less than ten pounds, but could frequently hold her head in various postures and that the onset of Clayton's symptoms and limitations was during the 1980s. (*Id*. at 374.)

On October 31, 2006, Clayton saw Dr. Christopher Gomez, a neurologist at the University of Chicago Hospitals. (*Id*. at 347, 403.) Clayton reported that she first noticed symptoms of choking and slurred speech in her late 20s. (*Id*.) She also complained of migraine

10

headaches, intermittent sleep problems, restless leg syndrome, occasional stress incontinence, and fatigue. (*Id*.) Dr. Gomez's examination revealed nystagmus, moderate speech problems, slow but normal alternating finger and hand movements and finger-to-nose testing, mild tremor on heel-to-shin testing, increased reflexes, and an asymmetrical gait. (*Id*. at 348, 404.) Clayton saw Dr. Gomez an average of once every six months during the following two years. (*Id*. at 406-11.)

In March 2007, Dr. Gomez reported that Clayton felt slightly worse and she "only slightly limit[ed] her work by allowing her husband to help her bring the laundry up or down" the stairs. (*Id.* at 406.) In November 2007, Clayton's walking was "slowing down" and Dr. Gomez prescribed a walker. (*Id*. at 408-09.) In May 2008, Clayton complained that she had headaches that occurred more than once a month – often during her menstrual cycle. (*Id.* at 410.) She also reported that her gait had worsened. (*Id*.)

In November 2008, Dr. Gomez reported that Clayton was essentially stable and that her gait had not changed since her last visit. (*Id*. at 411.) Clayton explained that she had occasional migraine headaches, which she related to her menstrual cycle, and noted that her vision was correctable to 20/30. (*Id*.) She also reported that she exercised three times a week with an elliptical and a treadmill. (*Id*.) Dr. Gomez encouraged Clayton to use a walker more often for stability. (*Id*.)

On March 23, 2009, Dr. Gomez opined that Clayton could sit more than two hours at a time, and for at least six hours in an eight-hour day, stand for twenty minutes at a time, and stand/walk for less than two hours in an eight-hour day. (*Id*. at 426.) He also opined that Clayton needed to take more than ten unscheduled rest breaks, each lasting twenty minutes,

during an eight-hour workday. (*Id*.) Furthermore, Dr. Gomez stated that Clayton needed to elevate her legs to heart level eighty percent of the day, that she could perform fine manipulation less than ten percent of the workday, and use her hands to grasp and turn objects up to sixty percent of the day. (*Id*. at 426-27.)

## II. Hearing Testimony

At the March 26, 2009 hearing in front of ALJ Stewart, Clayton testified that prior to March 31, 1999 – the date her insured status expired – she had difficulty walking and felt like she had bricks on her feet. (*Id*. at 36.) Clayton further testified that before she left her job in 1994, she could not type and her hands were clumsy. (*Id*. at 33.) She also testified that she had migraine headaches twice a month that caused her to lay down in a dark room, close her eyes, and sleep. (*Id*. at 33-34, 36.) Also, Clayton explained that she did not go to a medical doctor until 2001 because she "just thought she was uncoordinated" and that she thought she was fatigued because her small children were wearing her out. (*Id*. at 35, 38.) Clayton went to a medical doctor in 2001 after an individual at her health club noticed that she was not walking properly while she was on a treadmill. (*Id*. at 34.)

Clayton's husband, Paul Clayton, testified that his wife had mobility problems and that she could not do certain tasks, such as carrying the laundry up from the basement, because she was afraid she would trip on the stairs. (*Id.* at 38.) He also testified that Clayton was often fatigued, had headaches, and that once a week when he came home from work, she was already in bed. (*Id*.)

The medical expert, Dr. Jilhewar, testified at the hearing that as of October 8, 2001 Clayton's impairment met the requirements of Section 11.17 Listing of Impairments, Appendix

12

1, Subpart P based on the Mayo Clinic documentation of dysmetria, which he explained as the incoordination of the hands. (*Id*. at 42.) He further testified that prior to October 2001, Clayton could have performed sedentary work, but not light or medium work due to her gait difficulties. (*Id*. at 44.) Moreover, Dr. Jilhewar testified that Clayton's cerebral atrophy would have taken some time to develop, although it could happen in a matter of days due to a stroke. (*Id*. at 43.) Although he testified that he did not know how long it took to develop in Clayton's case, based on the MRI that showed moderately severe posterio fossa atrophy of the cerebellum, Dr. Jilhewar testified that it would have taken some time to reach that level of atrophy. (*Id*.)

VE Hoiseth testified that there were 4,700 sedentary unskilled order clerk jobs, 11,000 sedentary unskilled general office clerk positions, and 15,000 sedentary unskilled receptionist jobs in the Chicago area in the year 2001. (*Id*. at 50.) She further stated that all of these jobs required good bilateral manual dexterity and that sedentary unskilled work requires good upper extremity dexterity. (*Id*. at 51.)

## LEGAL STANDARDS

### I. Standard of Review

"Courts have the statutory power to affirm, reverse, or modify the Social Security Administration's decision, with or without remanding the case for further proceedings." *Allord v. Astrue,* 631 F.3d 411, 415 (7th Cir. 2011). Because the Appeals Council denied Clayton's request for review, the Court reviews the ALJ's decision as the Commissioner's final decision. *See id.; Schaaf v. Astrue,* 602 F.3d 869, 874 (7th Cir. 2010). The Court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and substantial evidence supports the decision. *See Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010). "When

13

reviewing for substantial evidence, [courts] do not displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue,* 617 F.3d 923, 926 (7th Cir. 2010) (citation omitted).

## II. Disability Standard

A person is disabled for purposes of DIB if there is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Liskowitz v. Astrue,* 559 F.3d 736, 740-41 (7th Cir. 2009). Moreover, to qualify for DIB "a claimant must show that the disability arose while he or she was insured for benefits." *See Liskowitz*, 559 F.3d at 740; *see also Allord*, 631 F.3d at 416. In general, the claimant bears the burden of proof regarding her disability conditions. *See Allord,* 631 F.3d at 416 (citing 20 C.F.R. § 404.1514).

In determining whether a claimant is disabled under Section 423(d)(1)(A), the Commissioner created a five-step, sequential analysis under 20 C.F.R. §§ 404.1520 and 416.920. *See Castille,* 617 F.3d 926-27; *Larson v. Astrue,* 615 F.3d 744, 748 (7th Cir. 2010). Under this five-step analysis, a claimant must show that: (1) she is not presently employed; (2) her impairment is severe; and (3) her impairment meets or is equal to an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See O'Connor-Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir. 2010); *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351-52 (7th Cir. 2005). If the impairment meets or equals one of the listed impairments in step three, the claimant qualifies for benefits and the ALJ makes no further inquiries. *See Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir.

2008). If the claimant does not qualify for benefits under step three, the analysis proceeds to step four, which requires an assessment of whether the claimant has insufficient residual functional capacity ("RFC") to perform her past relevant work. *See id.*; *see also Simila v. Astrue,* 573 F.3d 503, 513 (7th Cir. 2009). If the impairment precludes performance of past work, under step five, the ALJ considers the claimant's age, education, past relevant work experience, and RFC to determine if other work exists that would accommodate the claimant. *See Craft,* 539 F.3d at 674. The claimant bears the burden of proof through step four of this analysis. *See Schmidt v. Astrue,* 496 F.3d 833, 841 (7th Cir. 2007). At step five, the burden shifts to the Commissioner to establish that the claimant can successfully perform a significant number of jobs existing in the national economy. *See Liskowitz,* 559 F.3d at 743.

## ANALYSIS

In her summary judgment motion, Clayton argues that: (1) the ALJ's assessment of her date of disability onset is not substantially supported because he failed to follow the requirements of Social Security Ruling 83-20; and (2) the ALJ erred in his credibility determinations.

Before the Court addresses Clayton's argument concerning SSR 83-20, the Court notes that although an "ALJ need not specifically address every piece of evidence," he must at least "provide a 'logical bridge' between the evidence and his conclusions." *O'Connor-Spinner,* 627 F.3d at 618; *see also Parker v. Astrue,* 597 F.3d 920, 921 (7th Cir. 2010). This requirement is essential so that the reviewing courts "can assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review." *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010).

Here, the ALJ's Findings of Facts and Conclusions of Law partially state: "Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I (20 C.F.R. 404.1525 and 404.1526). (Admin. Record, at 17.) The ALJ's entire analysis in support of this conclusion states:

> Ashok Jilewar, MD, a Board-certified internist, testified as a medical expert. He said that her impairment met Listing 11.07 as of October 8, 2001. He testified that the records from Mayo Clinic and from other medical providers show that as of that date, she had the limitation of gait and station required by section 11.04B of the Listings.

(*Id.*)

The ALJ, however, did not explain why he rejected Dr. Jilewar's testimony that Clayton met the third requirement under the five-step analysis, namely, that Clayton's impairment met the listings. *See O'Connor-Spinner,* 627 F.3d at 618. Moreover, in an exchange with Clayton's counsel at the March 26, 2009 hearing, the ALJ stated on the record that Clayton was "clearly disabled as of 2001" in the context of the ALJ's requests for medical records pre-dating 2001. (Admin. Record, at 48.) The ALJ, however, never explained this contradictory statement in his findings of fact and conclusions of law. *See Parker,* 597 F.3d at 924. In fact, the ALJ did not point to any substantial evidence in support of his conclusion. *See Campbell v. Astrue,* 539 F.3d 473, 480 (7th Cir. 2010) ("substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation and internal quotations omitted). As such, the ALJ has failed to provide the Court with a "logical bridge" between the evidence in the record and his conclusion that Clayton was not disabled at the third-step of his analysis so that the Court can conduct a meaningful review Clayton's disability claim. *See Zurawski v. Halter,* 245 F.3d 881, 888 (7th Cir. 2001) (ALJ must "articulate at some minimal

level analysis of the evidence) (citation omitted).

Although the Court deferentially reviews the Commissioner's decision, the Court cannot merely rubber stamp the ALJ's decision. *See Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). The Court therefore remands this matter for a further determination of whether Clayton had an impairment that meets or is equal to one of the listed impairments in 20 C.F.R. Part 404, Subpart P., Appendix 1 as required at step three of the sequential analysis. *See Ribaudo v. Barnhart,* 458 F.3d 580, 583-84 (7th Cir. 2006) (remanding ALJ's decision based on failure to evaluate any evidence at step three); *see also Simila,* 573 F.3d at 514 (if ALJ finds claimant's impairment meets a listing level, claimant is automatically disabled).

Meanwhile, the Commissioner's argument that the ALJ's failure to follow Social Security Ruling ("SSR") 83-20 for assessing disability onset is inapplicable under the circumstances must wait for another day. To clarify, if the ALJ determines on remand that Clayton is disabled, he must then address whether Clayton's disability arose when she was last insured, namely, March 31, 1999, under SSR 83-20. *See Eichstadt v. Astrue,* 534 F.3d 663, 666 (7th Cir. 2008); *see also Briscoe,* 425 F.3d at 352 (when "a claimant is found disabled but it is necessary to decide whether the disability arose at an earlier date, the ALJ is required to apply the analytical framework outlined in SSR 83-20 to determine the onset date of disability.").

Finally, because Clayton's argument concerning the ALJ's credibility determinations concerns her RFC under step four of the ALJ's analysis, as well as the ALJ's failure to address SSR 83-20, the Court will not address this argument at this time.

17

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's motion for summary judgment or remand, and denies the Defendant's motion for summary judgment.

Dated: July 7, 2011

                                            **ENTERED**

                                            _____
                                            **AMY J. ST. EVE**
                                            **United States District Court Judge**